## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA

DAVID RUSSELL on behalf of himself and others similarly situated,

Plaintiff,

v.

CS CONTRACT SOLUTIONS, LLC d/b/a/ CONEXA TECHNOLOGIES and DRIVE MANAGEMENT GROUP, CITIZENS TELECOM SERVICES COMPANY, LLC d/b/a FRONTIER COMMUNICATIONS, BENJAMIN SUNDERLAND, and KEITH CRISTOBAL, in their individual and professional capacities,

Defendants.

Civil Action No.:
24-cv-2421-CEH-AAS

**COLLECTIVE ACTION AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff David Russell ("Russell" or "Plaintiff") on behalf of himself and others similarly situated, by and through his attorneys, Crabill PLLC, hereby allege as follows against Defendants CS Contract Solutions, LLC ("CS") d/b/a Conexa Technologies ("Conexa") and Drive Management Group ("DMG"), Citizens Telecom Services Company, LLC d/b/a Frontier Communications ("Frontier"), Benjamin Sunderland ("Sunderland"), and Keith Cristobal ("Cristobal") (altogether, "Defendants"):

## PRELIMINARY STATEMENT

1.      While they are focused on and boast about being acquired by Verizon Communications, Inc. in a 20-billion-dollar deal,[1] Frontier is engaging in flagrant violations of the law that rob Technicians of their hard-earned wages.

2.      Technicians are employees who perform installation, maintenance, and repair work that is critical to Frontier's business of providing cable, telephone, and internet services to customers.

3.      Frontier hires Technicians through companies such as Conexa and coordinates with Conexa and DMG to oversee, supervise, and manage Technicians who provide services to Frontier's customers.

4.      Together, Defendants supervise and control all aspects of their employment of Technicians.

5.      For example, Defendants pay Technicians on a piece rate basis, meaning Defendants pay Technicians based on various rates they assign to specific jobs or services Technicians complete.

6.      Although Technicians typically work approximately 65 hours per week, Defendants fail to pay Technicians overtime compensation for hours worked

---

[1]      *See*      https://investor.frontier.com/news/news-details/2024/Verizon-to-acquire-Frontier/default.aspx (last visited on January 22, 2025).

in excess of 40 hours in a workweek, instead paying them on piece rate basis without accounting for overtime compensation at all.

7.    In addition to failing to pay Technicians their earned overtime wages, Defendants also move quickly to silence anyone who dares to challenge their unlawful wage practices.

8.    On April 4, 2024, Russell, a former Technician for Defendants, called a supervisor and complained about Defendants' refusal to provide him per diem pay he had earned pursuant to Defendants' policy and practice of paying Technicians a flat rate of $130 when they are required to travel 50 or more miles to their first assigned jobsite.

9.    In response, Russell's supervisor reaffirmed that Defendants would not pay him the per diem pay he had earned.

10.    Russell then told his supervisor that he intended to pursue legal action related to the per diem wages Defendants owed him.

11.    The very next day, Defendants terminated Russell in a blatant act of retaliation against him for engaging in protected activities, including the complaint he made to his supervisor about Defendants' wage violations.

12.    Plaintiff brings claims under the Fair Labor Standards Act, 29 U.S.C. §§ 201, *et seq.* ("FLSA") as a collective action pursuant to 29 U.S.C. § 216(b), on

behalf of himself and all other similarly situated employees comprising the proposed FLSA Collective (defined *infra* ¶ 128).

## JURISDICTION AND VENUE

13.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over this action because it involves federal questions regarding the deprivation of Plaintiff's rights under the FLSA.

14.     Pursuant to 28 U.S.C. § 1391, venue is proper because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this District.

## PARTIES

A.     **Plaintiff David Russell**

15.     Russell is a resident of the State of Florida.

16.     Russell was employed by Conexa from in or around 2020 through on or around April 5, 2024.

17.     Russell was employed by Frontier from in or around February 2023 through on or around April 5, 2024.

18.     At all relevant times, Russell was an "employee" of Conexa, DMG, and Frontier within the meaning of all relevant statutes and regulations.

**B.**     **Defendant CS Contract Solutions, LLC d/b/a Conexa Technologies and Drive Management Group**

19.     CS is a domestic business corporation that provides telecommunications services including project-based staffing solutions for both outside and inside plant projects in Florida and across the country.

20.     CS's principal place of business is located at 165 S River Road, Suite C, Bedford, New Hampshire 03110.

21.     Upon information and belief, on or around September 2, 2022, CS established an internal department under the trade name Drive Management Group which is dedicated to providing project and vendor management services telecommunications companies.

22.     Around the same time, CS began providing project and vendor management services to telecommunications companies through DMG.

23.     Upon information and belief, in or around 2023, CS rebranded and started conducting business under the trade name Conexa Technologies.

24.     At all relevant times, Conexa controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

25.     At all relevant times, Conexa established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

26.     At all relevant times, Conexa maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

27.     At all relevant times, Russell was an "employee" within the meaning of all relevant statutes and regulations.

**C.     Defendant Benjamin Sunderland**

28.     Sunderland is an owner of Conexa and a resident of Vermont.

29.     At all relevant times, Sunderland controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

30.     At all relevant times, Sunderland established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

31.     At all relevant times, Sunderland maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

32.     At all relevant times, Sunderland was an "employer" within the meaning of all relevant statutes and regulations.

**D.     Defendant Keith Cristobal**

33.     Cristobal is an owner of Conexa and is a resident of New Hampshire.

34.     At all relevant times, Cristobal controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

35.     At all relevant times, Cristobal established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

36.     At all relevant times, Cristobal maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

37.     At all relevant times, Cristobal was an "employer" within the meaning of all relevant statutes and regulations.

**E.    Defendant Citizens Telecom Services Company, LLC d/b/a Frontier Communications**

38.     Frontier is a domestic telecommunications business corporation that regularly provides broadband, voice, and television services to residential and business customers in Florida and across the country.

39.     Frontier's principal place of business is located at 401 Merritt 7, Norwalk, Connecticut 06851.

40.     At all relevant times, Frontier controlled and directed the terms of employment and compensation of Russell and all persons similarly situated.

41.     At all relevant times, Frontier established, implemented, disseminated, and controlled the employment policies applicable to Russell and all persons similarly situated, including, *inter alia*, policies concerning timekeeping, work allocation, task supervision, monitoring work product, and payroll.

42.    At all relevant times, Frontier maintained and exercised authority to hire, fire, discipline, and promote Russell and all persons similarly situated.

43.    At all relevant times, Frontier was an "employer" within the meaning of all relevant statutes and regulations.

## FACTS

**A.    Background**

44.    Frontier provides a range of telecommunications and technology services, including high-speed fiber internet, video, voice, and additional network solutions for residential, business, and wholesale customers in Florida and across the United States.

45.    Frontier enters into agreements with companies who provide Frontier with Technicians who perform installation, maintenance, and repair work in connection with cable, telephone, and internet services provided to Frontier's customers.

46.    CS provides Technicians to telecommunications companies, enabling the telecommunications companies to deliver services to their customers.

47.    In or around July 2022, Frontier and CS entered into an agreement for CS to provide Technicians to Frontier to perform services for their customers.

48.    As noted above, on or around September 2, 2022, CS began providing project and vendor management services under the trade name Drive Management Group.

49.    Soon thereafter, DMG began overseeing, supervising, and managing all Technicians Frontier hired through companies such as CS and Gridsource, Inc.

50.    Also, in 2022, CS rebranded and began doing business under the trade name Conexa Technologies.

51.    Together, Defendants employ hundreds of Technicians at any given time who provide telecommunications and technology services to Frontier's customers.

**B.    <u>Joint Employment and Indicia of Control</u>**

52.    Defendants function as a single integrated enterprise that together provide telecommunications and technology services to Frontier's customers throughout Florida and across the country.

53.    Defendants supervise and control all aspects of the employment of workers who perform installations, maintenance, repairs, and other work in connection with cable, telephone, and internet services provided to residential, commercial, and wholesale customers of Frontier.

54.    By way of example only, after Frontier hires a Technician through Conexa, Defendants determine the geographic region that the Technician will provide services to Frontier's customers.

55.    If a Technician wants to be transferred to a different geographic region, then the Technician must submit a transfer request to Conexa which has to be approved or denied by Defendants.

56.    Also, Defendants require Technicians to follow certain polices and procedures related to their job duties which include, *inter alia*, running cables, setting up equipment such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes, and ensuring that all connections are properly configured.

57.    Defendants set the work schedules for all Technicians, including the start and end time of each shift, as well as a myriad of other conditions of employment.

58.    Defendants schedule Technicians to perform services for Frontier's customers Mondays through Saturdays.

59.    Defendants do not provide services by Technicians on Sundays.

60.    Defendants mandate that Technicians regularly work at least five days per week.

61.    During regular virtual meetings each Friday called "tailgate meetings," Defendants provide Technicians with their work schedule for the following week.

62.    Defendants also provide Technicians with online accounts to access Frontier's MTPN software.

63.    Through MTPN accounts, Defendants provide Technicians with information about their daily assignments, including the addresses of the customers they have been assigned to and the services they are required to perform for those customers.

64.    Defendants instruct Technicians to retrieve information about their daily assignments by logging into their MTPN accounts each morning they are assigned to work.

65.    Defendants also use the MTPN accounts to track Technicians' locations and the status of the work they perform for Frontier's customers.

66.    Indeed, Defendants require Technicians to indicate in their MTPN accounts when they are "en route" to a jobsite.

67.    Each workday, Defendants require Technicians to be "en route" to their first assigned jobsites by 8:00 a.m.

68.    If a Technician fails to begin his commute to his first assigned jobsite by 8:00 a.m., then an employee from Frontier or Conexa attempts to contact the Technician to determine why the he failed to start his commute on time.

69.    Defendants can and do reprimand and fire Technicians who do not timely begin their commutes to their first assigned jobsites.

70.    After a Technician arrives at a jobsite and before he begins performing work for the customer associated with the jobsite, Defendants requires the Technician to record in his MTPN account that he has arrived at the jobsite.

71.    When a Technician completes work he was assigned to provide to a customer, Defendants direct the Technician to record in his MTPN account that he finished the job.

72.    Defendants also require Technicians to write notes in their MTPN accounts about any complications or issues that may have arisen during the work they performed for a customer.

73.    Additionally, Defendants mandate that Technicians contact an employee of DMG to provide certain information about any complications or issues that arose during their work.

74.    If a Technician arrives at a jobsite and the customer is unable to accept service, then Defendants require that the Technician record the job as "suspended" in his MTPN account.

75.    After a Technician completes work for a customer or if a customer is not able to accept service at the time the Technician arrives at a jobsite, then Defendants direct the Technician to proceed to his next assigned jobsite.

76.     After a Technician completes his other daily assignments, Defendants require the Technician to return any "suspended" jobs to see if the customers associated with those jobsites are able to accept service.

77.     If a customer at a suspended jobsite is still unable to accept service when the Technician returns, then Defendants reschedule the work for that customer to be complete on a different day.

78.     Defendants also share resources, align their business strategies, and have intertwined management structures related to the supervision of work performed by Technicians.

79.     For example, Conexa maintains training facilities in Battleboro, Vermont and Connecticut that provide training to Technicians on how to perform various tasks related to cable, telephone, and internet services provided to residential and commercial customers of Frontier.

80.     Conexa also provides training to Technicians who perform services for Frontier's customers during virtual meetings.

81.     Additionally, Defendants require Technicians to travel to Frontier's warehouses throughout Florida so that Frontier can provide them with equipment such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes they need to perform services for Frontier's customers.

82.    Defendants maintain employment records for their employees, including timesheets, payroll reports, and wage statements.

83.    Indeed, Defendants require Technicians to submit timesheets to their supervisors at Conexa.

84.    After a Conexa supervisor signs off on the submitted timesheet, the timesheet is transferred to Conexa's payroll department for a supplemental review.

85.    Upon information and belief, if the payroll department approves the timesheet, then the timesheet is sent to Frontier for a final approval.

86.    After a timesheet is finally approved by Frontier, then Conexa provides Technicians with a document called a Payroll Report which contains information about the amount of compensation to be paid to a Technician in connection with a specific pay period.

87.    Further, upon information and belief, Conexa and DMG have access to Frontier's MTPN software and have the ability to program the software so that jobs for Frontier's customers are assigned to Technicians based on the Technicians' assigned location(s) and work experience.

**C.    Defendants Fail to Pay Technicians Their Earned Overtime Pay**

88.    Defendants pay Technicians on a piece rate basis, meaning Defendants pay Technicians based on various rates they assign to specific jobs or services Technicians complete.

89.    Typically, Technicians work five days per week for a total of approximately 65 hours.

90.    However, Defendants have denied and continue to deny Russell and all other similarly situated employees overtime compensation for hours worked in excess of 40 hours in a workweek, instead paying them on piece rate basis, without accounting for overtime compensation at all.

**D.    Late Payment of Wages**

91.    Defendants have engaged in a consistent pattern and practice of failing to pay Russell and all other similarly situated employees all of their wages on or before their regularly scheduled paydays.

92.    As stated above, Defendants have established a weekly pay period spanning from Sunday to Saturday for Technicians.

93.    Defendants have also established every second Friday following each pay period as the regularly scheduled pay day for all Technicians.

94.    Nevertheless, Defendants have routinely failed to pay Russell and all other similarly situated employees' wages they earned in the preceding pay period on or before their regularly scheduled pay day.

95.    As a result of Defendants' late payment of wages, Russell and all other similarly situated employees have suffered concrete harm.

96.    Specifically, Russell and all other similarly situated employees have been, *inter alia*: (i) deprived of money to which they had a right, thereby costing them the time value of their money; (ii) deprived of the opportunity to invest their money; and/or (iii) unable to use their wages to pay bills and satisfy other financial obligations.

**E.    <u>Plaintiff David Russell</u>**

**i.    Wage Violations**

97.    CS hired Russell as a Technician in or around 2020.

98.    In February 2023, through CS, Frontier hired Russell to work as a Technician and provide services to its customers in the Saint Petersburg and Seminole, Florida area.

99.    As a Technician for Frontier, Russell performed installation, maintenance, and repair work related to cable, telephone, and internet services Frontier provides to customers.

100.    Russell's job duties working for Defendants included, *inter alia*, running cables, setting up equipment such as modems, routers, optical network terminals, fiberoptic drops, and set-top boxes, and ensuring that all connections are properly configured.

101.   To complete jobs for customers, Defendants required Russell to travel to Frontier's warehouses in Tampa, Florida at the beginning of each workweek so that Frontier could provide him with the above-referenced equipment.

102.   In connection with the work that Russell performed for Frontier's customers, Defendants paid Russell on a piece rate basis.

103.   For example, in connection with work Russell performed for customers on April 4, 2023, Defendants paid Russell at a rate of $118 for each job he completed described as "FTTP – Install Fiber Service-Internet/Data Only," at a rate of $0.54 for each job he completed described as "FTTP – Install Fiber Service-Place UG Drop in Conduit/Subduct," at a rate of $35 for each job he completed described as "FTTP – Fiber Installation HR," and at a rate of $24 for each job he completed described at "FTTP – Fiber Trip Charge." *See* Ex. A.

104.   However, Defendants never paid Russell overtime compensation for any hours worked in excess of 40 hours in a workweek.

105.   Instead, Defendants paid Russell on a piece rate basis without accounting for overtime compensation at all.

106.   On average, Russell worked approximately 65 hours per week.

107.   For example, for the workweek spanning April 2 to April 8, 2023, Russell worked approximately 65 hours.

108.    In connection with the April 2 to April 8, 2023 pay period, Defendants paid Russell $3,821.50 in wages based on a piece-rate pay structure.  *See* Ex. B.

109.    As a result, Russell's regular rate of pay for the April 2 to April 8, 2023 pay period was $58.79 ($3,821.50 piece-rate pay ÷ 65 hours).

110.    Since he worked approximately 25 overtime hours during the April 2 to April 8, 2023 pay period, Russell earned overtime pay equal to $2,204.63 (25 overtime hours x $88.19 per hour).

111.    However, Defendants did not account for overtime compensation in connection with the wages paid to Russell related to the April 2 to April 8, 2023 pay period.  *See id.*

112.    Instead, Defendants paid Russell at his flat rate for all hours worked during the April 2 to April 8, 2023 pay period.

113.    As a result, Defendants paid Russell only $1,469.75 in connection with the 25 overtime hours he worked during the April 2 to April 8, 2023 pay period.

**ii.    Retaliation**

114.    Defendants have a policy and practice of paying Technicians a per diem amount equal to $130 when Technicians are required to travel 50 or more miles to their first assigned jobsite.

115.    On March 27, 28, 29, and 30, 2024, Defendants required Russell to travel 50 or more miles to his first assigned jobsites for each of those days.

116. As a result, Russell submitted timesheets seeking payment of the $130 per diem amounts for March 27, 28, 29, and 30, 2024 based on Defendants' policies and practices. *See* Ex. C.

117. On or around April 4, 2024, Amber Nemmers ("A. Nemmers"), a payroll employee for Conexa, sent Russell an instant message through Telegram Messenger and told Russell that Frontier was refusing to provide him with per diem travel wages he earned on March 27, 28, 29, and 30.

118. Later that day, Russell called Ryan Nemmers ("R. Nemmers"), the Director of Operations at Conexa, and complained about Defendants' refusal to pay him the per diem travel wages he earned on March 27, 28, 29, and 30.

119. In response, R. Nemmers reiterated A. Nemmers's assertion that Frontier was supposedly refusing to pay Russell his earned per diem travel wages and claimed that Conexa could not pay him the per diem amounts without Frontier sending them money to cover the wage payments.

120. Additionally, in an apparent attempt to justify Defendants' refusal to pay Russell his earned wages, R. Nemmers claimed that Frontier had recently conducted an audit of Conexa and discovered that Conexa was improperly approving the payment of per diem travel wages to Technicians working for Defendants in Connecticut even when Technicians were not commuting 50 or more miles to their first assigned jobsites.

121.   As a result, R. Nemmers claimed that Conexa had to repay Frontier roughly $500,000 for Conexa's supposed improper approval and payment of per diem travel wages to Technicians working in Connecticut.

122.   Russell responded by telling R. Nemmers that he intended to pursue legal action in connection with Defendants' refusal to pay him his earned per diem travel wages.

123.   R. Nemmers responded to Russell, "I would love to see how that plays out" and the call between Russell and R. Nemmers ended immediately thereafter.

124.   Later that day, Russell memorialized what he and R. Nemmers discussed during their call in an instant message to R. Nemmers via Telegram Messenger.

125.   Over the next several days, Russell took off from work to attend to a medical emergency involving a family member.

126.   On April 12, 2024, in a blatant act of retaliation, R. Nemmers sent Russell a letter stating that Defendants had terminated his employment and that they had backdated the termination to April 5, 2024.

127.   Specifically, Nemmers stated, *inter alia*:

It is with regret that we inform you that your employment with CS Contract Solutions will be terminated effective April 5, 2024.  Your stipulation that you would only fulfil the needs of the business with compensation for mileage that was unwarranted does not align with our requirements.   Furthermore,  the  threatening  of  legal  action  and

20

harassment of company executives is considered unbecoming and hostile behavior which is in violation of our company Code of Conduct.

## FLSA COLLECTIVE ACTION ALLEGATIONS

128.    Plaintiffs bring his FLSA claims as a collective action on behalf of himself and all other similarly situated persons who have been employed by Defendants as Technicians at any time during the full statute of limitations period (the "FLSA Collective").

129.    At all relevant times, Plaintiff and the FLSA Collective were similarly situated, had substantially similar job requirements, were paid in the same manner and under the same common policies, and were subject to Defendants' policy and practice of: (i) failing to pay overtime wages at a rate of one and one-half times their regular rates of pay for all hours worked in excess of 40 hours in a workweek; and (ii) failing and refusing to timely pay all wages owed on or before their regularly scheduled paydays.

130.    At all relevant times, Defendants have been fully aware of the duties performed by Plaintiff and the FLSA Collective and that Plaintiff and the FLSA Collective are not exempt from the protections of the FLSA.

131.    Defendants' violations of the FLSA have been willful, repeated, knowing, intentional, and without a good faith basis, and have significantly damaged Plaintiff and the FLSA Collective.

132.    As a result of their unlawful conduct, Defendants are liable to Plaintiff and the FLSA Collective for the full amount of their unpaid and late wages, with interest, an additional equal amount as liquidated damages, and reasonable attorneys' fees and costs incurred by Plaintiff and the FLSA Collective.

133.    While the exact number is unknown to Plaintiff at this time, upon information and belief, there are approximately 3,000 members of the FLSA Collective.

134.    Plaintiff is currently unaware of the identities of the individual members of the FLSA Collective.

135.    Accordingly, the Court should require Defendants to provide Plaintiff with a list of all members of the proposed FLSA Collective, along with their last known home addresses, telephone numbers, and email addresses, so that Plaintiff may provide the members of the FLSA Collective with notice of this action and an opportunity to make an informed decision regarding whether to participate in the same.

### FIRST CAUSE OF ACTION
### VIOLATIONS OF THE FLSA: FAILURE TO PAY OVERTIME
### *(On Behalf of Plaintiff and the FLSA Collective)*

136.    Plaintiff, on behalf of himself and the FLSA Collective, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

137.   During the full statutory period, Plaintiff and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C. §§ 201, *et seq.*, and applicable regulations thereunder.

138.   The FLSA requires covered employers, including Defendants, to compensate employees at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek.

139.   Plaintiff and the FLSA Collective were not exempt from the requirement that their employers pay them overtime wages under the FLSA, and they are entitled to be paid overtime by Defendants for all hours worked in excess of 40 hours in a workweek during the full statute of limitations period.

140.   During the statute of limitations period, Defendants have engaged in a policy and practice of failing to compensate Plaintiff and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek.

141.   As a result of Defendants' failures to compensate Plaintiff and the FLSA Collective at a rate not less than one and one-half times their regular rate of pay for all hours worked in excess of 40 hours in a workweek, Defendants have violated the FLSA and/or applicable regulations thereunder.

142.   Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiff and the FLSA Collective in accordance with the FLSA.

143.   Defendants' violations of the FLSA have significantly damaged Plaintiff and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

## SECOND CAUSE OF ACTION
## VIOLATIONS OF THE FLSA: LATE PAYMENT OF WAGES
### *(On Behalf of Plaintiff and the FLSA Collective)*

144.   Plaintiff, on behalf of himself and the FLSA Collective, hereby repeats and realleges the foregoing allegations as if set forth fully herein.

145.   During the full statutory period, Plaintiff and the FLSA Collective were protected by the provisions of the FLSA, 29 U.S.C. §§ 201, *et seq.*, and all applicable regulations thereunder.

146.   The FLSA requires covered employers, including Defendants, to pay employees all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

147.   Plaintiff and the FLSA Collective were not exempt from the requirement that Defendants timely pay them their wages.

148.   During the statute of limitations period, Defendants have engaged in a policy and practice of failing to pay Plaintiff and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends.

149.   As a result of Defendants' failure to pay Plaintiff and the FLSA Collective all compensation earned in a particular workweek on the regularly scheduled pay day for the period in which such workweek ends, Defendants have violated the FLSA and/or applicable regulations thereunder.

150.   Defendants have acted willfully and deliberately in maintaining an intentional practice of failing to compensate Plaintiffs and the FLSA Collective in accordance with the FLSA.

151.   Defendants' violations of the FLSA have significantly harmed Plaintiff and the FLSA Collective and entitle them to recover the total amount of their unpaid wages, an additional equal amount in liquidated damages, prejudgment interest, and attorneys' fees and costs.

### THIRD CAUSE OF ACTION
### VIOLATIONS OF THE FLSA: RETALIATION
#### *(On Behalf of Plaintiff Individually against Defendants)*

152.   Plaintiff hereby repeat and reallege the foregoing allegations as if set forth fully herein.

153.    During the full statutory period, Plaintiff was protected by the provisions of the FLSA, 29 U.S.C §§ 201, *et seq.*, and applicable regulations thereunder.

154.    As set forth above, Plaintiff complained to Defendants regarding their violations of the FLSA, including, *inter alia*, failing to pay Plaintiff all of his earned wages.

155.    Defendants retaliated against Plaintiff for his protected activities by, *inter alia*, terminating his employment.

156.    As a direct and proximate result of Defendants' unlawful retaliatory conduct in violation of the FLSA, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm for which he is entitled to an award of damages.

157.    Plaintiff is further entitled to an award of liquidated damages, prejudgment interest, and attorneys' fees and costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the FLSA Collective, respectfully requests that this Court:

A.    Declare that the practices complained of herein are unlawful under applicable federal law;

B.    Grant an injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Grant Plaintiff an award of damages, in an amount to be determined after a trial, to compensate him for all non-monetary and/or compensatory damages he has suffered, including, *inter alia*, compensation for his mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, and emotional distress;

D.    Grant Plaintiff an award of damages, in an amount to be determined after a trial, for any and all other monetary and/or non-monetary losses he has suffered;

E.    Grant Plaintiff an award of prejudgment interest on the damages they are awarded to the greatest extent permitted by law;

F.    Grant Plaintiff an award of reasonable attorneys' fees to the greatest extent permitted by law;

G.    Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. § 216, and direct Defendants to provide Plaintiff with a list of all members of the FLSA Collective, including all last known addresses, telephone numbers, and e-mail addresses of each such person, so Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

H.    Equitably toll the statute of limitations for all members of the FLSA Collective from the date of this filing until they are provided notice of this instant action and opportunity to join the same;

I.    Determine the damages sustained by Plaintiff and the FLSA Collective as a result of Defendants' violations of the FLSA, and award those damages against Defendants and in favor of Plaintiff and the FLSA Collective plus such pre-judgment and post-judgment interest as may be allowed by law;

J.    Award Plaintiff and the FLSA Collective an additional equal amount as liquidated damages because Defendants' violations were without a good faith basis;

K.    Award Plaintiff and the FLSA Collective their reasonable attorneys' fees and costs and disbursements in this action including, without limitation, any accountants' or experts' fees; and

L.    Grant Plaintiff and the FLSA Collective such other and further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the FLSA Collective, hereby demands a trial by jury on all issues of fact and damages.

Dated: January 22, 2025          **CRABILL PLLC**
     Lakewood Ranch, Florida

By: _____
    Taylor J. Crabill

71-01 Austin Street
Forest Hills, New York 11375
Tel: (727) 335-1030
tcrabill@crabilllawfirm.com

*Attorney for Plaintiff and the
proposed FLSA Collective and Lead
Counsel*

29